The RHODE ISLAND CHARITIES TRUST, Plaintiff,

v.

ENGELHARD CORPORATION, Defendant.

**C.A. No. 97–369L.**

United States District Court, D. Rhode Island.

Aug. 8, 2000.

---

Michael P. DeFanti, Brent R. Canning, Hinckley, Allen & Snyder Providence, RI, for plaintiff.

Benjamin V. White, III, Vetter & White, Providence, RI, H. Jerome Strickland, Robert C. Norman, Jr., Jones, Cork & Miller, Macon, GA, for defendant.

*OPINION AND ORDER*

LAGUEUX, District Judge.

This matter is before the Court on cross motions for summary judgment. This is a

breach of contract case and the parties ask this Court to delve into the realm of the implied covenant of good faith and fair dealing. Specifically, in this matter the Court is confronted with the vexing question of whether and to what extent a term should be implied into a well-negotiated contract by utilizing the implied covenant of good faith and fair dealing. In Count I of the Amended Complaint plaintiff, Rhode Island Charities Trust ("RICT"), asks this Court to interpret the contract and seeks a declaration that defendant Engelhard Corporation ("Engelhard") has violated the express terms of that agreement. In Count II, RICT alleges that even if the terms of the contract permit the action taken by Engelhard, such action is proscribed by the implied covenant of good faith and fair dealing. In Count III, plaintiff alleges that Engelhard's conduct constitutes a breach of fiduciary duty owed to plaintiff. Plaintiff, RICT has moved for partial summary judgment pursuant to Fed.R.Civ.P. 56(d) on Count II seeking a declaration that Engelhard has breached the covenant of good faith and fair dealing with respect to the performance of the contract governing the relationship between the parties. Defendant has moved for summary judgment on all three Counts set forth in the Amended Complaint. For the reasons set forth below, this Court denies Engelhard's motion for summary judgment on Count II but grants its motion for summary judgment on Count I and III. This Court also grants RICT's motion for partial summary judgment on Count II and makes a declaration as to the proper interpretation of the contract applying the implied covenant of good faith and fair dealing.

## I. Background

The parties do not dispute the following recitation of the facts. In 1937, RICT was formed for purposes of distributing money grants for charitable causes. In 1948, RICT purchased Southern Clays, Inc., a kaolin mining and processing company located in middle Georgia. Kaolin is a clay utilized in many industries, but the principal use of the type of clay mined and processed by Southern Clays was in the paper industry.

In 1963, RICT sold the assets of Southern Clays to Freeport Sulphur Company. At the time, the assets consisted of a modern processing plant, mining equipment, a laboratory and certain clay lands either owned by Southern Clays or on which it held long-term mineral leases. In addition to the asset sale pursuant to an Asset Purchase Agreement, Southern Clays and Freeport entered into a ninety-nine year Indenture, whereby Southern Clays leased and assigned to Freeport its right to mine the clay on lands it owned (the "Fee Properties") and on land which it held the right to mine through various leases (the "Leased Properties") in exchange for royalties. The Indenture involved a ninety-nine year lease of twenty-three Fee Properties, and an assignment of sixteen Leased Properties, with termination dates ranging from 1967 to 2023. *See* Indenture, §§ 22,23 and Defendant's Ex. E. The leases at the heart of this case, Nos. 5, 6, 7 and 8, as described in paragraph 23 of the Indenture (collectively, the "Veal leases"), all had termination dates of March 23, 1995. Southern Clays then dissolved and RICT succeeded to all of its rights under the Indenture.

Pursuant to the Indenture, RICT received a one and one-half percent (1.5%) royalty on the sale of the clay and clay products. In 1985, Engelhard acquired Freeport and became successor in interest, as Lessee, under the Indenture.

The provisions of the Indenture detailing the calculation of the royalties payable to RICT by Engelhard are as follows:

5. Royalties

(a) [Engelhard] agrees to pay [RICT] for each Royalty Period on (i) processed clay . . . (ii) unprocessed clay and—(iii) "mixed products" . . . sold in such Royalty Period . . . as hereinafter provided in clauses (i), (ii) and (iii) . . .

(i) A royalty equal to one and one-half percent (1.5%) of [Engelhard's] Net Receipts from sales in such Royalty Period of each kind of process clay ... processed mineral ... and each kind of unprocessed mineral ... derived from the Properties.

(ii) ... (1.5%) of the Net Receipts that would have been received by [Engelhard] in such Royalty Period if a number of tons of processed clay which could have been produced from the number of tons derived from the Properties of each kind of unprocessed clay sold in such Royalty Period.

*See* Indenture, § 5(a). The Indenture defines Properties as "all of the Fee Properties and Leased Properties collectively." Indenture, § 1(a).

Of critical importance to this case is the fact that the Indenture permits Engelhard to deduct from the one and one-half percent (1.5%) royalty any real estate taxes on the Fee Properties and, as to the Leased Properties any advance royalties and production royalties payable to the landowners. *See* Indenture, § 7(a)-(c). In subparagraph 7(a) of the Indenture, Engelhard, agrees to pay "(i) all real estate taxes imposed on or assessed against the fee properties," and "(ii) all payments (other than royalties based on production, provision for which is made in subparagraph (c) of this Paragraph 7) which the person named as lessee thereunder is required to make under the Leases." Subparagraph 7(b) allows Engelhard to deduct the payments made under 7(a) from the aggregate royalties otherwise payable to RICT pursuant to the Indenture. Finally, subparagraph 7(c) permits Engelhard to credit and deduct from the royalties owed to RICT any production royalties payable to the landowners of the various Leases.

The deduction provisions of paragraph 7 read as follows:

(b) The aggregate amount of all payments made or payable by [Engelhard] for all Royalty Periods within any calendar year pursuant to subparagraph (a) of this Paragraph 7 shall be deducted from the aggregate royalties payable by [Engelhard] for such Royalty Periods pursuant to Paragraph 5 hereof.

(c) [Engelhard] also agrees to pay to the person entitled thereto all royalties based on production required to be paid under the Leases only so long as [Engelhard] remains an assignee thereof; provided, however, that [Engelhard] shall be entitled to a credit for any amounts paid or payable by it pursuant to this subparagraph (c) against royalties thereafter payable to [RICT] under the provisions of Paragraph 5 of this Agreement.

Indenture, §§ 7(b)-(c), Pl.'s Ex.A (emphasis added). As is evident from the plain language of the contract, all payments, except for production royalties on the Leased Properties, made by Engelhard relating to the Properties may be deducted from the *aggregate* royalties payable to RICT. In contrast, deductions for production royalty payments made to the landowners of the Leased Properties are dealt with in a separate deduction provision which does not contain the word "aggregate."

At the time the Indenture was entered into in 1963, with a few exceptions, the Lease durations were substantial and the Veal leases at issue in this case had upwards of 30 to 35 years to run. Production royalty obligations to landowners were between $0.10 and $0.20 per cubic yard. Although mining on the Leased Properties would have been profitable to RICT at then current prices, there was limited mining on these properties at that time. In the 1980s, however, mining began, and during the period of May, 1981 to May, 1995, RICT earned income from royalties which ranged between $500,000 to $1,100,000 per year. *See* Plaintiff's Ex. H.

Among the assigned leases in the Indenture, and the leases at issue in this case, were leases with the Veal families. The Veal leases were 50–year leases that dated

back to the 1930s. They were renegotiated in 1945 and 1970 and, as a result, would have expired in 1995. Under the original leases, the production royalties payable to the Veals were $0.11 per cubic yard of mined clay. In the 1980s the Veals demanded more money and threatened litigation. For that reason and others that are not relevant, the Veal properties were not mined in the 1960s and 1970s.

Although Engelhard was uncertain of what it would do about the Veal leases in the mid 1980s, it was well aware that the Indenture did permit, with limited restrictions, renegotiation of the assigned Leases. The pertinent provision of the Indenture reads as follows:

> (e) It is expressly understood that [Engelhard] shall, without obtaining the consent of [RICT] (or any transferee or the Bank provided in Paragraph 8 hereof), be entitled to enter into any agreement to alter, modify (aside from complete termination), renew or extend any and all Leases and enter into new or additional leases or agreements with respect to any Leased Properties covered thereby, to such extent as [Engelhard] may deem desirable, provided, however, that [Engelhard] shall not make any alteration or modification of any Lease or other arrangement in connection with such Lease (other than alterations, modifications or arrangements contemplated by the terms of the Leases now in effect or which would result by reason of the provisions of any Lease now in effect from the exercise of any option contained therein) which with respect to the period prior to the normal termination date of such Lease would increase any fixed costs to be paid by [Engelhard] thereunder or would increase the amount of royalties payable by [Engelhard] thereunder with respect to any minerals, ores or substances permitted to be mined by [Engelhard] on the date hereof, unless [Engelhard] agrees to pay such increased fixed costs or additional royalties.

Indenture, § 2(e), Plaintiff's Ex. A. Thus, it is clear that the Indenture gives absolute discretion to Engelhard to amend and extend the Leases, provided, however, that Engelhard absorb any increased royalties payable to landowners as a result of the amendment through to the original termination date of the Leases. Paragraph 2(e) does not address the treatment of increased royalty payments to the landowners after the original expiration date of the amended and/or extended Leases. Yet, pursuant to § 5(c) of the Indenture, "any other rights" acquired by way of an extension on the Leases, made by Engelhard, are treated as "Leased Properties" and "royalties shall be payable in respect thereof." Indenture, § 5(c).

In the mid to late 1980s, Engelhard evaluated its options with respect to the Veal properties. It identified the following options: (1) accelerate mining on the Veal properties in order to extract as much clay as possible prior to the 1995 expiration date; (2) abandon the Veal leases and purchase replacement clay; or (3) renegotiate the Veal leases to extend the time for mining and agree to increased payments to the Veals. *See* Defendant's memo., p. 14. At some point during either 1988 or 1989, Engelhard decided it would be best to proceed with renegotiations of the Veal leases. Initially, Engelhard was unaware that the Indenture could be interpreted to permit the deduction of increased production royalties to the landowners under the amended leases from royalties payable to RICT. Thus, in its initial preparation of the amended Veal leases, Engelhard assumed it would have had to pay royalties to both the Veals and RICT.

On or around January 16, 1990, Engelhard and the Veals agreed that production royalties would be increased to $3.00 per cubic yard on three of the leases and $2.90 on one lease and that those leases would be extended for twenty years from the date of execution of the amendment. *See* Defendant's memo., p. 22 and McKenzie Aff., p. 17. This is approximately a 3000

percent increase in landowner payments under the Veal leases and completely wiped out the royalties of $1.21 per cubic yard that were payable to RICT for mining the clay on these properties. *See* Plaintiff's memo., p. 6 and Amended Complaint, § 22. The amendments to the Veal leases were conditioned upon approval by the Board of Directors of Engelhard based in New Jersey. While the original version of the Capital Authorization Request ("CAR") prepared for presentation to the Board of Directors of Engelhard did not indicate an intent to deduct the increased landowner royalties, the final CAR Board letter, circulated on August 1, 1990, was revised to include the following language: "After 1995 (the original termination date of the Veal leases), the royalty payments to the Veals can be deducted from royalties paid to RICT." *See* Defendant's memo., p. 25 and Foote/McKenzie Dep., Ex. 44. Execution of the amended Veal leases was approved by the Board of Directors of Engelhard on August 9, 1990. *See* Foote/McKenzie Dep., Ex. 46.

Pursuant to paragraph 2(e) of the Indenture, from the time Engelhard entered into the amended Veal leases through the first half of 1995, Engelhard absorbed the increased payments to the landowners, which totaled $1,830,169 [1]. *See* Davis Aff., p. 11 and Defendant's Exhibits J, K, L and M. In other words, these payments were not deducted from the royalties paid to RICT during those years because of the express provision of § 2(e) of the Indenture. Consequently, the lease amendments did not impact RICT until 1995. Upon expiration of the original Veal lease terms in 1995, Engelhard began deducting the increased Veal payments from the aggregate royalties payable to RICT.

The result was dramatic. Throughout the history of the royalty arrangement, RICT received royalty payments every six months. These checks usually exceeded $300,000. In contrast, the check for the last six months of 1995 was $30,000. This trend continued in the years that followed as Engelhard continued to deduct landowner royalties on the amended Veal leases from the total royalties payable to RICT.

As stated earlier, during the Veal lease amendment approval process in 1990, Engelhard interpreted the Indenture to mean that the increased landowner royalties under the amended leases could be deducted from the aggregate royalties payable to RICT in the second half of 1995 and thereafter. However, it does not appear that Engelhard anticipated that those deductions due to production royalties payable under the amended Veal leases would cause a reduction in the royalties payable to RICT from other Leased and Fee Properties. *See* Plaintiff's memo., p. 7 and Plaintiff's Ex. S. But that has, in fact, occurred. In short, the deductions from the royalties paid to RICT because of the amendments to the Veal leases for the mining of Veal clay have eaten into the aggregate royalties payable to RICT from mining non-Veal clay. *See* Plaintiff's Ex. S. Indeed, testament to this unexpected result can be gleaned from the fact that the Indenture did not expressly provide for such a scenario. Therefore, plaintiff is before this Court asking for a construction of the Indenture to prevent that from happening.

After realizing that the Veal lease amendments caused this drastically unprofitable result for RICT, Engelhard took the position that the Indenture authorized the action taken. It relied on § 2(e) of the Indenture, the provision granting authority to Engelhard to amend the Leases. RICT responded by filing this suit, claiming that Engelhard violated the contract and the implied covenant of good faith and fair dealing in addition to its fiduciary duty to RICT by making these deductions from aggregate royalties payable to RICT. As stated earlier, RICT has moved for partial

---

**1.** Note that the lease with Vaughn Veron Veal and Howard Veal was canceled in January, 1993 with the knowledge and concurrence of RICT. *See* McKenzie Aff., pp. 20–21.

summary judgment on Count II while Engelhard has filed a motion for summary judgment on all three Counts.

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1991).

Plaintiff's motion is one for partial summary judgment pursuant to Fed.R.Civ.P. 56(d). Partial summary judgment under Rule 56(d) is separate and distinct from a motion for summary judgment under Rule 56(c). Rule 56(d) arms the court with a tool to "narrow the factual issues for trial." *Rivera–Flores v. Puerto Rico Tel.Co.*, 64 F.3d 742, 747 (1st Cir.1995). The rule provides that when "judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary," the court may "ascertain what material facts are actually and in good faith controverted." Fed.R.Civ.P. 56(d). Based upon such an inquiry, the court may then devise an appropriate order "including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just." *Id.*

The standard for ruling on a Rule 56(d) motion is "identical to that deployed when considering a summary judgment motion under Rule 56(c)." *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Ed.*, 915 F.Supp. 1267, 1279 (D.R.I. 1996) (citing *Flanders & Medeiros, Inc. v. Bogosian*, 868 F.Supp. 412, 417 (D.R.I. 1994), *aff'd in part, rev'd in part*, 65 F.3d 198 (1st Cir.1995)). A grant of summary judgment "is not appropriate merely because the facts offered by the nonmoving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Electric Co.*, 777 F.Supp. 167, 169 (D.R.I.1991). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability or likelihood[.]" *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987). Summary judgment is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The coincidence that both parties move simultaneously for summary judgment does not relax the standards under Rule 56. *See Blackie*, 75 F.3d at 721. Barring special circumstances, a district court must consider each motion separately, drawing inferences against each movant in turn. *See id.* (quoting *EEOC v. Steamship Clerks Union Local 1066*, 48 F.3d 594, 603 n. 8 (1st Cir.)), *cert. denied*, 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

## III. Discussion

As is evident from the factual background, this is a contract interpretation case. Because the Indenture did not specifically provide for the events that tran-

spired subsequent to the Veal lease amendments, this Court is required to interpret the Indenture under recognized principles of contract construction. The issue to be decided is whether and to what extent under the Indenture, landowner production royalties paid under the amended leases can be deducted from aggregate royalties payable to RICT, once the original lease expiration dates have been reached. For the reasons outlined in detail below, this Court holds that after the original expiration date of an assigned lease, production royalties payable to any landowner under an amendment to that Lease may be deducted from royalties generated from clay mined on that Leased Property only. As discussed below, this interpretation of the Indenture results from use of the implied covenant of good faith and fair dealing and is also based on a fair reading of the Indenture as a whole utilizing accepted rules of contract construction in order to effectuate the intent of the parties.

■ As the parties do not dispute the application of Georgia law to this case, this Court will proceed by applying Georgia law since that is the jurisdiction chosen in the choice of law provision in the Indenture. *See* Indenture, § 19. Defendant is a New Jersey corporation but the contract at issue relates to clay mining in Georgia and Freeport, its predecessor, was Georgia based. As this Court has stated many times, under the established law of Rhode Island, a choice of law provision in a contract is enforceable where the transaction bears a reasonable relationship both to Rhode Island and another state. *See Honey Dew Associates, Inc. v. M & K Food Corp.*, 81 F.Supp.2d 352 (D.R.I.2000). In this case, there is a reasonable relationship between the transaction at issue and Georgia, therefore, the Court will apply the law of Georgia in construing the Indenture. *See* R.I. Gen.Laws § 6A–1–105; *Providence & Worcester R.R. Co. v. Sargent Greenleaf, Inc.*, 802 F.Supp. 680, 687 (D.R.I.1992) (holding that a choice of law provision in a contract is enforceable where the transaction bears a reasonable relationship both to Rhode Island and another state).

## A. The Implied Covenant of Good Faith and Fair Dealing

■ Plaintiff relies heavily upon the implied covenant of good faith and fair dealing in arguing that there should be an implied limitation upon the discretion granted to Engelhard in the Indenture to amend the leases and charge back the increased costs thereof to RICT. This Court agrees. Although it has been shrouded in mystery at times, the implied covenant of good faith and fair dealing is simply a residual gap-filling, default rule of contract law. In effect, it imposes limits upon one contracting party's ability to adversely impact the contract's value to the other party. Therefore, it determines when a party to a contract may no longer pursue his or her own self-interest but rather must engage in cooperative behavior by deferring to the other party's contractual interests. *See generally* 3 *Corbin on Contracts*, § 507 (Supp.1999) and 11 *Williston on Contracts*, §§ 31:8, 32:2 (4th ed.1999).

■ The implied covenant of good faith and fair dealing is usually employed in two situations, both of which apply to the situation in this case. First, it is utilized where the terms of the contract are ambiguous or do not cover the disputed conduct. *See, e.g., Continental Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7th Cir.), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992)(discussing how the obligation of good faith is another way to describe the effort made by the court to devise terms to fill contractual gaps); *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 876–77 (5th Cir.), *cert. denied*, 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989). Secondly, the implied covenant is also used where the action at issue is taken pursuant to a grant of discretion in the contract and the scope of that discretion has not been

designated. *See, e.g., Chrysler Credit Corp. v. Marino,* 63 F.3d 574, 579 (7th Cir.1995); *Occusafe, Inc. v. EG & G Rocky Flats, Inc.,* 54 F.3d 618, 624 (10th Cir. 1995) (holding that the court's inquiry focuses on whether the defendant's conduct affected the contracting parties' benefit of the bargain); *Travellers Int'l v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir.1994)(holding that where a contract confers discretion on one party, such discretion is limited by the obligation that it be exercised in good faith).

■ In Georgia, as in virtually all jurisdictions, the duty of good faith and fair dealing is implied into every contract. *See West v. Koufman,* 259 Ga. 505, 506, 384 S.E.2d 664, 666 (1989)(quoting Restatement (Second) of Contracts § 231 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")); *see also Jackson Electric Membership Corp. v. Georgia Power Co.,* 257 Ga. 772, 364 S.E.2d 556 (1988). Indeed, this duty requires that each party to a contract act in furtherance of the other party's reasonable expectations of the bargain. In the event that one party's actions are in conflict with or eviscerate the other party's reasonable expectations, a court may be required "to look to the substance rather than to the form of the agreement, and to hold that substance controls over form." 3 *Corbin on Contracts,* § 570, at 500 (Supp.1999). Georgia courts have followed this rule by recognizing "the time honored rule that where a decision is left to the discretion of a designated entity, the question is not whether it was in fact erroneous, but whether it was in bad faith, arbitrary or capricious so as to amount to an abuse of that discretion." *MacDougald Const. Co. v. State Hwy. Dept.,* 125 Ga.App. 591, 593, 188 S.E.2d 405, 406 (1972). In other words, the question is whether the exercise of that discretion is consistent with the intent of the parties. *See id.*

In its brief, Engelhard avers that Georgia courts have resisted applying the implied covenant of good faith and fair dealing in situations where one party to the contract simply does what the contract allows. It primarily relies upon the case of *Automatic Sprinkler Corp. of America v. Anderson,* 243 Ga. 867, 868, 257 S.E.2d 283, 284 (1979) to support this argument. In *Automatic Sprinkler,* an employee voluntarily terminated his employment and sued claiming that the company owed him specific amounts of both deferred and nondeferred incentive compensation under the company's compensation plan. This contract provided in pertinent part: "The award of any direct incentive is entirely within the discretion of the corporation and nothing contained herein will be construed to the contrary ... With respect to those representatives whose employment with the corporation is terminated (for reasons other than their disability or retirement), the payment or nonpayment of all or any direct incentive installments previously set aside but unpaid to them at the time of their termination, will rest in the absolute and final discretion of the Compensation Committee of the Board of Directors." *Automatic Sprinkler,* 243 Ga. at 867, 257 S.E.2d at 284.

The *Automatic Sprinkler* Court held that "[t]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." 243 Ga. at 868, 257 S.E.2d at 284 (quoting *MacDougald* at 594, 188 S.E.2d at 407("What the intent of the parties was in making the contract must control[.]")); *see also Marathon U.S. Realties v. Kalb,* 244 Ga. 390, 392, 260 S.E.2d 85 (1979). In addition, the Court found that the terms of the contract "in this case are unambiguous." *Id.* at 869, 257 S.E.2d at 285. Because the contract was unambiguous and, more importantly, because the exercise of the Board's discretion was consistent with the intent of the parties as expressed in the contract, the Court held that the duty of good faith was irrelevant in those circumstances. *Id.*

The holding in *Automatic Sprinkler* is reasonable and sound but it does not stand for the proposition that defendant proposes in this case. Defendant would have this Court decide that the implied covenant of good faith and fair dealing is inapplicable in all circumstances where one party to the contract exercises discretion granted to that party pursuant to the contract. That proposition is too broadly stated because another Georgia case supports the view that the implied covenant of good faith and fair dealing can be applicable to conduct permitted under the terms of the contract. *See Southern Business Machines of Savannah, Inc. v. Norwest Financial Leasing, Inc.,* 194 Ga.App. 253, 257, 390 S.E.2d 402, 406 (1990). In *Southern Business Machines,* the contract at issue expressly authorized Norwest, as assignee of certain leases, to contact the lessees and to collect payment from the lessees under the leases assigned to Norwest by Southern Business Machines. Southern Business Machines alleged that Norwest's exercise of this authority, expressly conferred upon it by the contract, caused the lessees to cancel the leases. Citing the rule expressed in *Automatic Sprinkler,* the trial court in *Southern Business Machines* found that Norwest's attempts to collect the monies owing under the leases was "a legitimate exercise of [its] right to contact the lessees [under the contract]." *Southern Business Machines,* 194 Ga.App. at 257, 390 S.E.2d at 406. The Georgia Court of Appeals reversed, holding that "[t]he provisions in the assignment contract purporting to authorize [Norwest] to contact lessees directly and to collect payment from them, did not expressly or impliedly authorize [Norwest] to exercise this power in a manner constituting a lack of good faith." *Id.*

Therefore, defendant's argument that there can never be a violation of the implied covenant of good faith and fair dealing when one party exercises discretionary authority expressly granted to it under the contract misses the mark. In rejecting an identical argument as that put forth by Engelhard, then Circuit Judge Scalia pointed out that "to say that every expressly conferred contractual power is of this nature is virtually to read the doctrine of good faith (or of implied contractual obligations and limitations) out of existence." *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1154 (D.C.Cir.1984)(holding that although the contract provided that increases could be made in management's sole discretion, that discretion was limited because there were some purposes for which the expressly conferred power could not be employed).

The holding in *Southern Business Machines* follows the well settled rule that, although courts are reluctant to rewrite contracts for the parties, they will imply promises or duties if justice so demands. *See Fisher v. Toombs County Nursing Home,* 223 Ga.App. 842, 845, 479 S.E.2d 180, 184 (1996) (quoting *Higginbottom v. Thiele Kaolin Co.,* 251 Ga. 148, 149, 304 S.E.2d 365 (1983)). "What courts are doing here, whether calling the process 'implication' of promises, or interpreting the requirements of 'good faith,' as the current fashion may be, is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." 3 *Corbin on Contracts,* § 507 at 500 (Supp.1999); *see also* 11 *Williston on Contracts,* §§ 31:8, 32:2 (4th ed.1999). Thus, the implied covenant of good faith and fair dealing is implicated where one party fails to recognize that "its duty to the spirit of the bargain is higher than its duty to the technicalities of the language [of the contract]." *Id.*

Furthermore, in discussing implied promises, or the doctrine of good faith, Corbin states that the covenant has a special application to promises to pay under a royalty agreement. "One who promises to pay a royalty ... proportional to his production or other performance has often been found to have promised by implication that he will use diligence and will neither wilfully nor negligently do any-

thing that will prevent or reduce the sums to be paid." 3 *Corbin on Contracts*, § 570 at 345 (1960). Such an application is to be expected because under a royalty arrangement the only benefit of the bargain to one party is the sum payable. Therefore, actions taken by one party that obstruct such payments are often found to violate the implied promise to maintain the royalties. In other words, it is the parties' intent to have royalties payable to one party that is paramount in the bargain.

■ Overall, it is fair to say that Georgia courts recognize that a party to a contract is bound by the implied covenant of good faith and fair dealing in the exercise of discretionary authority expressly granted to that party pursuant to the terms of the contract. This is because "whenever the co-operation of the promisee is necessary for the performance of the promise, there is a condition implied that the co-operation will be given." 194 Ga. App. at 256, 390 S.E.2d at 405 (quoting 17 Am.Jur.2d, *Contracts*, § 256). This rule flows from the concept that one party's actions, whether or not carried out pursuant to an express provision in the contract, cannot be exercised so as to decimate the other party's reasonable expectations of the bargain. *See Fisher*, 223 Ga.App. at 845–46, 479 S.E.2d at 184 (" 'Good faith' is a short hand way of saying substantial compliance with the spirit, and not merely the letter, of a contract.")(citing *Crooks v. Chapman Co.*, 124 Ga.App. 718, 185 S.E.2d 787 (1971)).

## B. Interpreting the Indenture Using the Doctrine of Good Faith

In the case sub judice, this Court's inquiry into the application of the implied covenant of good faith and fair dealing will focus on two key elements. First, whether the Indenture is ambiguous with respect to the deduction of production royalties payable to landowners after the expiration of the original lease terms. Secondly, whether the action of defendant does violence to the intent of the parties to the Indenture. Finally, this Court will have to determine whether and to what extent a term ought to be implied into the Indenture under the doctrine of good faith and fair dealing.

The rules for interpreting a contract in Georgia are similar to such rules in other jurisdictions. Interpretation of a contract involves three steps. First, the court decides if the contract language is unambiguous, and if so, the court enforces the clear terms of the contract. *See Lostocco v. D'Eramo,* 238 Ga.App. 269, 518 S.E.2d 690, 695 (1999). Second, if the contract is ambiguous, the court must apply rules of contract construction to resolve the ambiguity. *Id.* The basic rule of contract construction in Georgia is to give effect to the intent of the parties by reading the contract as a whole. The intent of the parties is to be determined by looking at the "four corners" of the contract. *See Tumo Construction, Inc. v. Lasky,* 158 Ga.App. 583, 584, 281 S.E.2d 325, 327 (1981)(citing *Stephens v. Parrino & Ware,* 138 Ga.App. 634, 635, 226 S.E.2d 809 (1976)). Third, if ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury. *See Lostocco,* 238 Ga.App. 269, 518 S.E.2d 690, 695. In this case, application of the third step is unnecessary.

■ Application of the implied covenant of good faith and fair dealing is appropriate in this case for two reasons. First, the Indenture is silent with respect to the challenged actions of Engelhard and that silence creates an ambiguity in the document. Second, Engelhard's attempt to deduct the increased production royalties payable under the amended leases from aggregate royalties payable to RICT contravenes the intent of the parties to the contract. This is why Engelhard's reliance on *Automatic Sprinkler* is misplaced. There, the Court found that the implied covenant of good faith and fair dealing was inapplicable because the contract at issue was unambiguous and the exercise of the Board's discretion was consistent with the intent of the parties to the contract. *See*

*Automatic Sprinkler,* 243 Ga. at 868, 257 S.E.2d 283. This case is easily distinguishable from *Automatic Sprinkler* because, as discussed in detail below, neither of the factors critical to the Court's holding in that case are present in this case.

Defendant contends that the Indenture is unambiguous with respect to the deduction of production royalties under the amended Veal leases after the original expiration date of those leases. Defendant relies on § 2(e) of the Indenture, which permits unilateral amendment of the Leases by Engelhard, to support its argument that any additional costs resulting from the amended leases should be deducted from aggregate royalties payable to RICT because that was intended by the parties. In short, defendant makes the preposterous argument that the parties contemplated that production royalties attributable to one amended Lease can be used to wipe out the royalties generated from other Fee and Leased Properties. Such a reading of the relevant provisions of the Indenture cannot be supported because that would be a clear violation of the intent of the contracting parties.

While it is clear that § 2(e) of the Indenture permits Engelhard to amend the Veal leases, it does not follow that this provision governs the deduction of production royalties from aggregate royalties payable to RICT *after* the original termination date of the leases. With respect to increased production royalties payable to landowners as a result of an amended lease, the Indenture provides "that [Engelhard] shall not make any alteration or modification of any Lease . . . which with respect to the period *prior* to the normal termination date of such Lease would increase any fixed costs to be paid by [Engelhard] thereunder or would increase the amount of royalties payable by [Engelhard] thereunder, unless [Engelhard] agrees to pay such increased fixed costs or additional royalties." Indenture, § 2(e). Thus, it is clear from the plain language of the Indenture that any increase in production royalties payable to

the Veals as a result of amending those leases, is to be borne by Engelhard *prior* to the normal termination date of such leases. However, § 2(e) does not expressly explain how an increase in production royalties under an amended lease is to be handled after the normal termination date of such lease. The Indenture clearly is silent on this issue and that is what creates the ambiguity in this case.

Engelhard argues that the production royalty payments have always been deducted from aggregate royalties under the standard deduction provisions in § 7 of the Indenture. Such an argument does not take into account the effect of Engelhard's exercise of absolute discretion in amending the leases and how that contravenes the intent of the parties in entering into a 99 year royalty arrangement. Section § 2(e) works as an exception to the standard deduction provision in § 7 by requiring Engelhard to bear any increased landowner costs that result from a lease amendment or extension prior to the original termination date of such lease. The parties could never have intended that after the normal termination date of an amended lease increased landowner royalties could be used to wipe out royalties generated by the other Properties. At oral argument, when confronted with the Court's question of whether the Indenture should be read to allow the large cost increases resulting from the amended Veal leases to eat up all of the royalties payable to RICT, defendant's counsel responded by saying that such was an inherent risk in the structure of the Indenture. *See* Transcript, p. 27. This Court disagrees.

It is clear that the Indenture is ambiguous with respect to production royalty deductions after the original expiration date of the amended leases. Contrary to defendant's argument, the Indenture does not expressly permit such deductions to be made against *aggregate* royalties. Although the Indenture expressly provides for the treatment of these deductions prior to the original termination date of the

amended leases, it is silent on the treatment of such deductions after the original termination date. Thus, the Indenture must be viewed as being ambiguous on the subject. Therefore, this Court must construe the Indenture to give effect to the intent of the parties as evidenced by the Indenture as a whole under the doctrine of good faith.

In this case, the deduction of the increased production royalties paid by Engelhard to the Veals under the amended leases are eviscerating the aggregate royalties payable to RICT. The increased production royalties payable under the Veal leases are now so great that they are almost greater than the Net Receipts generated from clay mined on all the Leased Properties and are threatening the Net Receipts from clay mined on the Fee Properties. It is unreasonable to think that RICT's predecessor would have entered into a royalty arrangement for 99 years and intended that its royalties could be devoured by the acts of defendant in amending a few leases.

The Court must consider the language contained within the four corners of the Indenture. "In deciding whether to imply promises or duties to the terms of a contract, [t]he introduction of an implied term into the contract of the parties ... can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties." *Fisher*, 223 Ga.App. at 845, 479 S.E.2d 180 (quoting *Higginbottom*, 251 Ga. at 149(1), 304 S.E.2d 365). In this case, there is no express term which governs the deduction of the increased production royalties under the amended leases after the original termination date thereof. One thing is clear. If the increased production royalties under the Veal leases are deducted from aggregate royalties payable to RICT, then those costs can wipe out all of the royalties payable to RICT that are generated from clay mined on other Leased Properties as well as the royalties generated from clay mined on the Fee Properties. In short, it is possible in the future that RICT will receive nothing under the Indenture and defendant will reap all the benefits of mining clay on the Properties owned by RICT. Such a result could not have been intended at the time the Indenture was executed, therefore, Engelhard's interpretation of the Indenture cannot conceivably be what the parties intended in entering into the royalty arrangement.

The Indenture provides that in return for the right to mine the Properties, Engelhard must pay RICT a royalty calculated by a percentage of the Net Receipts generated by the sale of clay or clay products. Quite simply, that is the benefit bargained for by plaintiff in this contract. The intent of the parties would be destroyed if the increased production royalty deductions under a few amended leases were allowed to completely eradicate the royalties payable to RICT from clay mining on all of the other Properties. This concept was so fundamental to the agreement that the parties need not have memorialized it expressly. It can reasonably be assumed that, with respect to the Leased Properties, RICT expected reduced royalties after expiration thereof because they were to be net of production royalty payments to the landowners. However, the parties could never have intended that production royalty payments to landowners would be used to deplete all of the royalties payable to RICT under the Indenture. Consequently, the implied covenant of good faith and fair dealing should be utilized as a gap-filler in this case in order to effectuate the intent of the parties.

Although courts are reluctant to rewrite a contract for the parties, they must imply terms or duties when justice, good faith, or fairness so demand. *See Fisher*, 223 Ga. App. at 845, 479 S.E.2d 180. RICT's situation fits these criteria, and a limitation on

the deduction of the increased production royalty payments to the Veals under the amended leases should accordingly be implied in this contract.

This Court holds that the increased production royalty payments to landowners under any amended lease will be deducted from the royalties generated by the mining of clay on that Leased Property only. Thus, the royalty payments for mining on other Properties will not be affected by an amendment to or extension of any one lease negotiated by Engelhard.

This implied term follows the express language in the contract and effectuates the intent of the parties without eviscerating the benefit of the royalty arrangement to RICT. At the end of the day, Engelhard will still be able to mine the Properties and deduct its increased costs of production royalties payable to landowners under an amended lease. However, such increased costs will be limited by Engelhard's good faith duty to preserve the royalties payable to RICT for mining on other Properties under the Indenture. That is, Engelhard may amend any lease and deduct the increased production royalty rates paid to landowners from royalties generated by that Leased Property, but it will not be allowed to have absolute discretionary power to amend leases and destroy the benefit bargained for in this contract relating to other Leased and Fee Properties. Thus, after the implied term is inserted in bold type, the relevant portion of § 2(e) of the Indenture reads as follows:

> [Engelhard] shall not make any alteration or modification of any Lease or other arrangement in connection with such Lease ... which with respect to the period prior to the normal termination date of such Lease would increase any fixed costs to be paid by [Engelhard] thereunder or would increase the amount of *royalties payable by [Engelhard] thereunder with respect to any minerals, ores or substances permitted to be mined by [Engelhard] on the date hereof, unless [Engelhard] agrees to pay such increased fixed costs* or additional royalties. **With respect to the period after the normal termination date of such Lease, any modification or alteration of any Lease or other arrangement in connection with such Lease which would increase any fixed cost to be paid by [Engelhard] thereunder or would increase the amount of royalties payable by [Engelhard] thereunder can be deducted from royalties payable to RICT generated from clay mined on such Leased Property only.**

For the foregoing reasons, plaintiff's motion for partial summary judgment on Count II is granted and defendant's motion for summary judgment on Count II is denied.

## C. Fiduciary Duty

■ Finally, this Court grants summary judgment for defendant on Count III since there was no fiduciary relationship between RICT and Engelhard. Under Georgia law, a relationship is considered to be confidential "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith." Ga.Code Ann. § 23–2–58 (1996). Although a confidential relationship between business people may arise, it is dependant upon the facts of each case. *See Cochran v. Murrah,* 235 Ga. 304, 307, 219 S.E.2d 421 (1975). There can be no fiduciary relationship when the parties are engaged in a transaction with each other in an effort to further their own separate business objectives. *See Parello v. Maio,* 268 Ga. 852, 853, 494 S.E.2d 331, 332 (1998) (citing *Kienel v. Lanier,* 190 Ga.App. 201, 204, 378 S.E.2d 359 (1989)); *see also Manning v. Engelhard Corp.,* 929 F.Supp. 1508, 1512 (M.D.Ga.1996)(holding that no confidential relationship is established in negotiation of mining leases where the agreements were entered into at arm's length and between equal parties)(applying Georgia law).

In this case, the Indenture was negotiated at arm's length for over a year between

the predecessors of these parties. *See* Sturges Depo., p. 169. It was clear that both sides were furthering their own business interests during these negotiations. As the president of Freeport Sulphur stated, it was clear that "Southern Clays, Inc. was a seller and a lessor dealing at arm's length with Freeport Sulphur Company as purchaser and lessee." Dufour Affidavit Motion, Def.'s Ex,O, p. 3. Plaintiff has put forth no evidence indicating the existence of a confidential relationship either at the time of entering into the Indenture or at some later date during the course of subsequent business dealings.

Therefore, plaintiff's contention, that there was a fiduciary relationship created as a result of business dealings through the years, is without merit. This is because the mere existence of a certain amount of trust and confidence between two people as the result of doing business together for a number of years, is not, in and of itself, sufficient to find the existence of a confidential relationship. *See Parello,* 268 Ga. at 853, 494 S.E.2d 331 (citing *Kienel,* 190 Ga.App. at 203, 378 S.E.2d 359). As a result, there was never any fiduciary relationship created between the parties and, thus, no breach of such a relationship. For the foregoing reasons, defendant's motion for summary judgment on Count III is granted.

### Conclusion

The contract at issue was negotiated for the sole purpose of paying royalties to one party in return for the right to mine the Fee and Leased Properties transferred to the other. Although the Indenture permits amendment of the Leases, it does not explicitly deal with the deduction of increased production royalties under the Leases after the original expiration date of these Leases. Therefore, Engelhard's deduction of those increased costs from the *aggregate* royalties payable to RICT over the last several years, was in violation of the implied covenant of good faith and fair dealing. Consequently, this Court has implied a term to limit such deductions that is in the spirit of the royalty arrangement and is consistent with the intent of the parties to the Indenture. Under this implied term, increased production royalties payable to a landowner as a result of an amended lease can only be deducted from royalties generated from clay mined on the particular Leased Property involved and cannot be used to reduce the royalties payable to RICT from mining on other Leased and Fee Properties. Therefore, plaintiff's motion for partial summary judgment on Count II is granted and defendant's motion for summary judgment on Count II is denied. Since Engelhard did not violate the express terms of the Indenture and no fiduciary duty was involved, it is entitled to summary judgment on Counts I and III. It is clear that as a result of this decision, Engelhard has been underpaying RICT the royalties due it for a number of years. The amount of those underpayments is the only issue remaining in this case. The Court will schedule a hearing and take evidence on this issue before entering judgment for plaintiff in this case on Count II. Defendant will be entitled to judgment on Counts I and III but no judgments will enter until this final issue of underpayment is resolved.

It is so ordered.