DECISION
This matter is before the Court for decision following trial to the Court sitting without a jury. Generally, the issues at trial related to the Town of Narragansett's (hereafter "the Town") interaction with Robert M. Palmisciano (hereafter "Palmisciano") concerning a real estate development known as Wincheck Estates. The Complaint was originally filed by the Town of Narragansett in June, 1993, alleging that Palmisciano breached the terms of an agreement entered by the parties on June 1, 1989. On or about January 1, 1991, Depositor's Economic Development Corporation (hereafter "DEPCO") accelerated its loan to Palmisciano, thus leading to the foreclosure of the property by DEPCO in June, 1993. On June 4, 1993, the Town brought suit, claiming Palmisicano breached the June 1, 1989 contract. Palmisicano counterclaimed, claiming that the Town misclassified the land as open space and that a penalty assessed was improper. On March 18, 1996, primarily due to the acceleration of the mortgage by DEPCO, Palmisicano filed a chapter 7 petition in bankruptcy. The claim of the Town was discharged, but Palmisicano retained the right to continue the prosecution of the counterclaim. Prior to filing an amended counterclaim, Palmisciano filed a notice of claim against the Town, claiming interference with contractual relations, and a constitutional claim that the Town deprived Palmisciano of his property without due process. On May 19, 1999, an amended counterclaim was filed against the Town. That counterclaim repeated the original claim regarding the misclassification of land, and added counts alleging breach of contract, interference with contractual rights and prospective contractual rights, and the due process claim. It also added Jeffrey Ceasarine, the Town Engineer (hereafter "Ceasarine"), and Clarkson Collins (hereafter "Collins"), the former Director of Community Development, as counterclaim defendants as to the tortious interference and due process counts.[1]
The parties have agreed that Count I of the amended counterclaim is to be severed for a later determination as to whether the open space tax issue should be remanded for consideration by the Tax Administrator. The parties further agree that Count VII, the due process claim, may be dismissed as barred by the applicable period of limitations.
Trial commenced as to the remaining issues in the amended counterclaim on March 29, 2006. Additional trial dates occurred on March 30, April 3, April 4, April 5, April 6, May 3, and May 25, 2006. At the conclusion of the trial, the parties submitted post-trial memoranda, as well as an agreed statement of facts. The parties' agreement as to certain facts is incorporated below into the Court's findings of fact. In addition, as to contested issues, the Court has made its own findings of fact and conclusions of law in accordance with R.C.P. 52(a).
 FINDINGS OF FACT 1. In 1986 and 1987, Palmisciano purchased certain land on Westmoreland Street and Woodward Avenue, Narragansett, Rhode Island with hopes of developing the same for residential use. The purchase price was $535,000. The land known as Parcel One had initially been listed as farmland and open space qualifying the land for tax benefits, and a statutory penalty was imposed for converting the land to residential use.
 2. In November 1986 Palmisciano submitted a preliminary proposal to Leonard Matarese (Town Manager), Steven Sasala (Narragansett Community Development Director), and Collins. Phase One of the project consisted of 55 residential lots of one acre or more with a connector street from Westmoreland Street to Woodward Avenue, and two cul de sacs.
 3. On May 20, 1987, the proposal was amended to eliminate the connector street and cul de sacs to reduce the density of the development.
 4. If all of the proposed lots met the minimum zoning requirements, Planning Board approval for the development was unnecessary. Woodward Avenue was an accepted road, having been accepted by a vote of the Town Council on December 7, 1938.
 5. From June, 1987 through the Council hearing of August 17, 1987, Palmisciano and Stephen Sasala, Community Development Director, engaged in discussions regarding the development which resulted in Mr. Sasala expressing gratitude to Palmisciano for his "receptivity" and for allowing input of the staff regarding the development. Palmisciano responded to the Town Council by referring to the high level of cooperation and communication between him and the Town.
 6. On August 17, 1987 the Town Council considered a petition from Palmisciano which requested "the Town Council to permit the development of Woodward Avenue as described and to accept Westmoreland Street as proposed, so as to facilitate and permit the final plan to be implemented." At its meeting of August 17, 1987, the Town Council considered the petition, characterizing the proposal as to Westmoreland Street as one requesting permission to build that street" in accordance with Town Standards." The Town Council voted unanimously to approve the petition and to accept both Westmoreland Street and Woodward Avenue as Town-accepted roads "after successful inspection by the Town Engineer." The approval was further conditioned on Palmisciano and the Town signing a contract "outlining the specifications needed to successfully complete the project — construction of all public utilities, roads, and the schematic design of the lots that are going to be cut adjacent to these roads."
 7. On September 16, 1987, consistent with the Town Council's conditional approval, the Town, through Stephen Sasala, submitted a proposal to Palmisciano outlining project specifics for the development of Wincheck Estates. He also sent a proposed form of agreement. Palmisciano did not sign the proposed agreement incorporating these conditions or offer a written response to this proposal.
 8. In October 1987, Palmisicano had plans drawn for the drainage system of Westmoreland Street. At trial, Palmisciano only produced "Sheet 2 of 3" of such plans entitled "Profile-Westmoreland Street," which sheet was admitted for the limited purpose of corroborating Palmisciano's recollection that such plans were prepared. However, the full plans were never found or introduced as an exhibit; the one page that was produced did not bear a stamp of a registered professional engineer, or a receipt stamp from the Town. The Town has absolutely no record of such plans having been filed. Although Palmisciano testified that engineering plans for the construction of Westmoreland Street were filed with the Town Engineer's office in October or November, 1987 (before construction began), the Court finds that no such plans were submitted to the Town Engineer, nor approved by the Town Engineer in advance of the commencement of construction.
 9. During November through December 1987, without prior approval of the Town Engineer, Palmisciano began work to install the drainage system on Westmoreland Street. The work was performed by Stephen Sherman of George Sherman Sons. That firm performed a number of excavation projects in Narragansett prior and subsequent to the Wincheck Estates development.
 10. On January 8, 1988 the Town, through Ceasarine, issued a Cease and Desist Order demanding that Palmisciano cease construction until plans with details were submitted and approved by the Town Engineer.
 11. Construction was not consistent with Town standards and plans were not approved by the Town Engineer as required by the 1987 Town Council action. In particular, the drainage pipe utilized was 12" plastic corrugated pipe, whereas the town standards at the time called for reinforced concrete pipe for such drainage applications. Additionally, catch basins were constructed with a 4" frame instead of an 8" frame as required by Town standards, and no steps were provided in the catch basins.
 12. On April 5, 1988 Palmisciano obtained a surety bond from Rumford Property Liability Insurance Company in the amount of $100,000 payable to the Town in the event the developer failed to complete the improvements as he had agreed to do. Palmisciano never obtained any prior approval from the Town of the amount of the bond, as he had agreed to do.
 13. The 1987 Town Council approval specifically called for inspection and approval of the project by the Town Engineer, and a specific agreement as to the details of construction. Palmisciano obtained neither in advance of his commencement and substantial completion of road improvements to Westmoreland Street. Gerald Judge testified on behalf of Mr. Palmisciano. He testified that, in November/December of 1987, the time Palmisciano commenced construction of the Westmoreland Street improvements, he served as the Superintendent of Highways and/or acting Director of Public Works, and that in such capacity that he had approved the Westmoreland Street project prior to construction. He also testified that he inspected the work after he had issued a permit for the construction. Furthermore, he testified that he would not have issued the permit without stamped engineering plans and approvals from others in the Town government who needed to sign off on approvals. Mr. Judge's testimony in this regard was not credible. No stamped plans were ever submitted to the Town prior to the commencement of the Westmoreland Street construction, and no permit ever issued for such work.[2] Even if Mr. Judge had, at that time, the general authority to issue permits for road construction projects, the specific approval granted by the Town Council for the Westmoreland Street construction was conditioned on approval by the Town Engineer.[3]
 14. As of May, 1988, Palmisciano still had not submitted stamped drawings for approval by the Town Engineer, nor entered into the agreement as to specifications, both of which were conditions to the 1987 Town Council approval. It was not until August 9, 1988 that Palmisciano first submitted stamped engineering drawings to the Town, and since construction was nearly complete, these drawings were basically "as built" drawings. On August 22, 1988 Ceasarine conducted an inspection of the site, and reviewed previously submitted plans of the drainage system and road improvements proposed for Westmoreland Street, and imposed conditions for the completion of the project. At that time, no storm drainage calculations were received. By letter of August 23, 1988, the Town placed Palmisciano on notice of the deficiencies in the project and the plans.
 15. Palmisciano began marketing lots at Wincheck Estates in mid-1988. The first lots were sold in July, 1988. Sales were slow and marketing was difficult. There is no credible evidence in the record to suggest that the Town took or refrained from taking any action which it was obligated to take which caused or contributed to the slow sale of lots at Wincheck Estates.
 16. On March 3, 1989 Palmisciano met with Vincent T. Izzo (Town Manager), Collins, Robert E. Winward (Town surveyor), Ronald Travers (Town Building Inspector), and Mark McSally (Town Solicitor). The purpose of the meeting was to iron out differences between Palmisciano and the Town, and establish an agreement relative to the project going forward. At that time, the Town agreed to draft a new agreement incorporating terms for the completion of the project, and pledged its cooperation with Palmisciano to assure a timely and successful completion of the project.
 17. On June 1, 1989 Palmisciano entered into a written agreement for the continuation and completion of the Wincheck Estates development. Subsequent to June 1, 1989, and as an addendum to the contract, it was agreed that Lots 16 and 17 would be merged. The parties agree that the signatures on the June 1, 1989 agreement were genuine, that the parties had authority to sign the agreement, that the Town Council subsequently approved the agreement, and that the agreement was duly recorded in the Records of Land Evidence on May 30, 1991.
 18. Notwithstanding the provisions of the June 1, 1989 agreement, Palmisciano never submitted final plans to the Town Engineer incorporating "as built" specifications or drainage calculations; he began the final asphalt course of pavement without approval by the Town Engineer; and he never submitted a project schedule to the Town Engineer for approval.
 19. At the time of the DEPCO foreclosure in June, 1993, subject to his compliance with the June 1, 1989 agreement, Palmisicano had nine buildable lots available for sale. The parties agree that for purposes of damages, if Palmisciano were to prevail on one or more of his claims, the average fair market value of each lot was $124,400.00. At the time of foreclosure, Palmisciano's outstanding mortgage was $690,000.00. His total loss, if liability were established, would be $426,000.00. ($1,116,000.00 less $690,000.00). This amount would be reduced by the construction costs to complete Westmoreland Street ($12,478.14), and the amount, if any, to complete Woodward Avenue.
 CONCLUSIONS OF LAW AND ANALYSIS
The claim set forth in Count II of the Amended Counterclaim is one for the Town's breach of the June 1, 1989 agreement. The evidence neither supports a claim for the Town's breach of any of the explicit terms of the agreement, nor a breach of the implied covenant of good faith and fair dealing. Rather, the Court's findings of fact support the conclusion that the Town made every effort to permit Palmisciano to complete his real estate development in accordance with Town standards, but that Palmisciano proceeded to skirt the requirements underpinning the initial approval of the Town Council.
In August, 1987, after months of cooperative input from Town officials, Palmisciano requested approval of the Wincheck Estates project from the Town Council without subdivision approval from the Planning Board. This was possible under the law as it existed at that time, as long as the lots proposed were within the proper zoning dimensions, and the roads and infrastructure were accepted by the Town. Palmisciano was made aware from the very inception of the project that Westmoreland Street and Woodward Avenue were to be accepted as Town roads only "after successful inspection by the Town Engineer." The approval was further conditioned on Palmisciano and the Town signing a contract "outlining the specifications needed to successfully complete the project — construction of all public utilities, roads, and the schematic design of the lots that are going to be cut adjacent to these roads."
Rather than proceed in accordance with the conditions imposed by the Town Council, Palmisciano failed to submit required plans and specifications to the Town Engineer and commenced construction without permits or approvals from the Town Engineer. Even if Mr. Judge had some authority to act in connection with highway approvals generally, the Council explicitly required Palmisciano to proceed only with the permission and approval of Mr. Cesarine, the newly appointed Town Engineer. This was not done. Furthermore, Palmisciano nearly completed his proposed road improvements before he signed the contract required by the Council. That a contract was signed after the fact in no way excuses Palmisciano's initial intransigence. Even after he signed the agreement in 1989, it was Palmisciano who continued to breach the agreements and understandings required for the successful completion of the project. Because the agreement did not require the Town to issue Certificates of Occupancy until after all infrastructure and improvements were in place and accepted by the Town, and since such final approvals were not obtained by Palmisciano, the Town was not in breach of this requirement of the agreement.[4] The Town also had been flexible in approving a bond from the Rumford Property and Casualty Insurance Company in the amount of $100,000, even though the developer failed to submit in advance the necessary information to allow the Town Engineer to determine the proper amount of the bond. After that insurer was declared insolvent in June, 1990, Palmisciano never posted alternative surety as required by the agreement.
Nor does the evidence support a finding that the Town breached the implied covenant of good faith and fair dealing. It is well-established in Rhode Island that "virtually every contract contains an implied covenant of good faith and fair dealing between the parties." Dovenmuehle Mortgage, Inc. v. Antonelli,790 A.2d 1113, 1115 (R.I. 2002) (quoting Centerville Builders,Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996)). This implied covenant exists between the parties to a contract so that contractual objectives may be achieved. Ide Farm Stable, Inc.v. Cardi, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972) (citingPsaty Fuhrman v. Housing Auth. of City of Providence,76 R.I. 87, 92, 68 A.2d 32, 35 (1949)); see also Rhode IslandCharities Trust v. Engelhard Corp., 109 F. Supp.2d 66, 73
(D.R.I. 2000) (holding that the implied covenant of good faith and fair dealing imposes a limitation upon one party adversely impacting the contract's value to the other party). While a claim for a breach of the covenant of good faith gives rise to a breach of contract claim, it does not give rise to an independent tort.A.A.A. Pool Serv. Supply Inc. v. Aetna Cas. Sur. Co.,121 R.I. 96, 99-100, 395 A.2d 724, 726 (1978). The applicable standard in determining whether the implied covenant of good faith and fair dealing has been breached is "whether or not the actions in question are free from arbitrary or unreasonable conduct." Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,66 F. Supp. 2d 317, 329 (D.R.I. 1999); see Reid v. Key Bank of S.Maine, Inc., 821 F.2d 9, 15 (1st Cir. 1987) (holding that good faith, under a subjective standard, is defined as "honesty in fact").
The Court finds that the Town, acting through its officials in good faith, sought to allow Palmisciano every opportunity to comport his behavior to the requirements established at the project's inception. The initial approval by the Town Council was conditioned upon the developer submitting plans and details of the construction and obtaining approval of the Town Engineer. The Court finds the testimony of Mr. Judge unconvincing as to his actual issuance of a permit and approval of construction, since the plaintiff was unable to produce a copy of the permit, or demonstrate that stamped plans or specifications were ever submitted to the Town Engineer in advance of construction. In addition, Mr. Judge was simply not the designee from whom the Town required approval. Finally, the record is devoid of any evidence that Mr. Palmisciano actually applied for a building permit or a certificate of occupancy for any lot in the subdivision. This project was not delayed due to any bad faith on the part of the Town or its officials. Rather, this project stalled due to Palmisciano's refusal to follow the rules established for the development, and his own marketing insufficiencies.
The remaining counts of the amended counterclaim allege claims of intentional interference with contract and prospective contractual relations. The basic elements of interference with prospective contractual relations are "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Mesolella v.City of Providence, 508 A. 2d 661, 669 (R.I. 1986). Furthermore, an intentional and malicious interference with a contractual relationship is actionable. Local Dairymen's Coop. Ass'n v.Potvin, 54 R.I. 430, 433, 173 A. 535, 536 (1934). The terms "malicious" and "malice" do not mean that proof is required of a defendant's malevolence, spite, or ill will towards the contracting party or parties, but rather that the words "malicious" and "malice" signify an unjustified interference by one with the contractual relationship of others. Prosser, Torts
§ 129 at 927-28 (4th ed. 1971).
Plaintiff presented two witnesses in an effort to prove the elements of the tortious interference counts. Ms. Julie Cole testified that she and her husband lived in California in 1990 and were considering returning to Rhode Island. They learned of the lots available for sale at the Wincheck Estates development. After looking at the properties, Ms. Cole wrote to Mr. Palmisciano, and stated "I'm sorry we won't be able to work together for now, but if you and the town can work out your differences, maybe we can do something in the future." Although her memory had faded, she did recall going to Town Hall and learning that there were some unresolved wetlands issues at the development. The testimony from other witnesses in fact acknowledged that, as of the Summer of 1990, there were, in fact, outstanding wetlands issues affecting some of the lots at the Wincheck properties. Ms. Cole's testimony, therefore, suggested only that the Town, at most, advised an inquiring member of the public as to the status of a particular project under the Town's purview.
As our Supreme Court recognized in Belliveau Bldg. Corp. v.O'Coin, to establish a claim of tortious interference, the plaintiff must establish that the defendants acted without justification or for an improper purpose. 763 A.2d 622, 628 (R.I. 2000). Unlike other intentional torts, however, "tortious interference with a contract `has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act * * *.'" Id. (quoting Restatement (Second) ofTorts § 767, cmt. b (1979)). Rather, the Restatement provides factors that a court should weigh in determining whether an alleged act of interference was improper or unjustified.[5]
Under the circumstances of this case, this Court concludes that evidence of a truthful account by municipal officials of the regulatory status of a matter within the jurisdiction of the municipality is insufficient to support a claim of tortious interference.
Similarly, the plaintiff called Dr. David Chronley, who testified that he had purchased three lots from Mr. Palmisciano. Subsequently, in 1991, he wrote to the Narragansett Town Council, anticipating that he may have some future difficulty in obtaining building permits due to the Town's position that building permits not issue until the developer completed his obligations imposed as conditions to the development. In fact, Dr. Chronley never actually applied for a building permit until 1994, after he had finalized plans for the construction of a home on one of the lots. Because Palmisciano had not posted a substitute bond after the failure of the Rumford Insurance Company, and had failed to complete the final course of asphalt paving on Westmoreland Street, Dr. Chronley, as well as other lot owners, had to pay a portion of an assessment necessary for the Town to complete construction of the road. Ultimately, well after Palmisciano's involvement in the project had ceased, the Town accepted Westmoreland Street as a Town road in 1997. Once again, there is nothing in Dr. Chronley's testimony to suggest that the Town or the individual town officials did anything to interfere with Palmisciano's contractual relationship with Dr. Chronley, either present or prospective. To the contrary, Palmisciano's sale to Dr. Chronley was complete in August, 1988 and August, 1989 at the time of the sale of the lots, well before Dr. Chronley pursued his application for a building permit.[6]
 CONCLUSION
In accordance with these findings of fact and conclusions of law, judgment should enter in favor of the Town of Narragansett, Jeffrey Ceasarine, and Clarkson A. Collins, as counterclaim defendants, on Counts II through VII of the amended counterclaim (including any claims mischaracterized as third party claims). Since Count I is substantively unrelated to the remaining counts and has been severed, the Court finds that there is no just reason for delay, and that final judgment may enter as to Counts II through VII of the amended counterclaim. Counsel shall submit a form of judgment consistent with this decision.
[1] Although denominated "Amended Counterclaim and Third Party Complaint," the pleading should be characterized simply as an amended counterclaim. Messrs. Ceasarine and Collins are additional counterclaim defendants. See R.I.R. CIV. P. 13(h).
[2] In his testimony Palmisciano was asked if Mr. Judge ever approved the Westmoreland Street drainage system. His response was carefully worded, that Mr. Judge "never raised an objection to the drainage system."
[3] Mr. Cesarine was only hired as the Town Engineer in June, 1987, shortly before the Town Council's conditional approval of the Winchek Estates project. He was the first full-time Town Engineer, and was hired specifically to bring an end to confusion and lack of professionalism in connection with Town infrastructure. It makes sense, therefore, that whatever lines of authority may have pre-existed Mr. Cesarine's arrival, that the approval of this project was specifically delegated to the Town Engineer.
[4] In fact, the evidence shows that, in one instance, under special circumstances and faced with the threat of litigation from a lot owner, the Town issued a building permit notwithstanding the failure to obtain all the required final approvals.
[5] Section 767 of the Restatement (Second) of Torts provides:
 In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
 (a) the nature of the actor's conduct,
 (b) the actor's motive,
 (c) the interests of the other with which the actor's conduct interferes,
 (d) the interests sought to be advanced by the actor,
 (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
 (f) the proximity or remoteness of the actor's conduct to the interference and
 (g) the relations between the parties. Id.
[6] Likewise, the facts established in this case are clearly distinguishable from the acts of municipal officials found to constitute tortious interference in L.A. Ray Realty v. TownCouncil of the Town of Cumberland, 698 A.2d 202 (1997). Therein, it was determined that the town officials demonstrated an obvious intent to interfere with a realtor's legitimate expectancy to develop their property under subdivision regulations in effect at the time of the filing of applications. Id. at 207. Nowhere in the record of this case is there any evidence of the type of municipal machinations or malevolence found to be actionable in the L.A. Ray case.